******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# 1ST ALLIANCE LENDING, LLC *v.* DEPARTMENT OF BANKING ET AL.
## (SC 20560)

Robinson, C. J., and McDonald, D'Auria,
Mullins, Kahn and Keller, Js.

*Syllabus*

Pursuant to statute (§ 36a-492 (c)), the Commissioner of Banking "shall automatically suspend the [license] of a mortgage lender" on the date that its surety bond is cancelled, but no automatic suspension shall occur if, prior to that date, the lender either provides proof of reinstatement of the bond or secures a new bond, or the lender "has ceased business and has surrendered [its license] in accordance with subsection (a) of section 36a-490 . . . ."

Pursuant further to statute (§ 36a-490 (a) (1)), any mortgage lender that holds a mortgage lender license and intends to permanently cease engaging in the business of mortgage lending shall file a request to surrender the license, and no surrender is effective until accepted by the Commissioner of Banking.

The plaintiff, a mortgage lender, appealed from the trial court's dismissal of its administrative appeal from the decision of the Commissioner of Banking to revoke the plaintiff's mortgage lender license. In 2018, the plaintiff and the defendant Department of Banking had been engaged in an enforcement proceeding that concerned the revocation of the plaintiff's license for reasons unrelated to the present appeal. In May, 2019, the issuer of the plaintiff's surety bond, which a lender is required to have in order to maintain its mortgage lender license, sent a notice to the plaintiff and the department, stating that the plaintiff's bond was going to be cancelled effective July 31, 2019. Upon receiving that notice, the department created a routine entry in the Nationwide Mortgage Licensing System and Registry (NMLS), indicating that the plaintiff's failure to replace or reinstate the bond would result in an automatic suspension and revocation of the plaintiff's license. The department also sent a letter to the plaintiff on June 7, 2019, stating that its failure to have a bond in effect on July 31, 2019, would result in the automatic suspension of its license. The plaintiff delayed in responding to the letter but ultimately sent an e-mail to the department on July 29, 2019, stating that it was voluntarily surrendering its license. The Commissioner of Banking did not accept the plaintiff's purported surrender of its license and, on July 31, 2019, made an online entry in the NMLS reflecting that the plaintiff's license was suspended. The following day, the department sent a series of notices to the plaintiff informing it that its license was suspended. After a hearing, the commissioner upheld the suspension, concluding that the plaintiff's failure to maintain a surety bond supported the license revocation. In dismissing the plaintiff's administrative appeal, the trial court concluded, inter alia, that the commissioner had not abused his discretion in declining to accept the plaintiff's purported surrender of its license. On the plaintiff's appeal from the trial court's judgment, *held* that § 36a-492 and the relevant statutory scheme granted the commissioner the legal authority to suspend and revoke the plaintiff's mortgage lender license, and, accordingly, this court affirmed the trial court's judgment: this court, having reviewed the text of § 36a-492 (c), concluded that the use of the word "shall" in that statutory provision was mandatory, and, therefore, the commissioner is statutorily required to suspend a mortgage lender license in the event of a surety bond cancellation unless the lender demonstrates that it had the bond reinstated or secured a new bond, or that it ceased doing business and surrendered its license in accordance with § 36a-490 (a); in the present case, the commissioner was statutorily required to suspend the plaintiff's license insofar as the plaintiff's surety bond was cancelled, the plaintiff did not obtain a letter of reinstatement of the bond or secure a new bond, and it did not effectively surrender its license before the cancellation of the bond, because, even if this court construed the plaintiff's July 29 e-mail to the department as a request to surrender, there was no evidence

in the record that the commissioner accepted that surrender, which is a prerequisite to the surrender of a license in accordance with § 36a-490 (a) (1); moreover, in light of the ongoing enforcement proceeding between the plaintiff and the department, any surrender or request to surrender would not have been effective because, pursuant to statute (§ 36a-51 (c) (1)), a surrender or request to surrender a license during an ongoing enforcement action does not become effective "except at such time and under such conditions as the commissioner by order determines," and the commissioner never set the time or conditions for the plaintiff's surrender or purported request to surrender its license; furthermore, there was no merit to the plaintiff's claim that the department or the commissioner should not be permitted to decline to take action on a request to surrender, and, in any event, there was no indication that the department unreasonably delayed in responding to the plaintiff's purported request to surrender; in addition, the trial court correctly concluded that the department was not estopped from suspending and revoking the plaintiff's license on the basis of representations the department made in its June 7 letter to the plaintiff, as it was not reasonable for the plaintiff to interpret that letter as any type of promise or to rely on the letter to the exclusion of the clearly applicable statutory scheme, which was explicitly referenced in that letter.

Argued October 21, 2021—officially released February 16, 2022*

*Procedural History*

Appeal from the decision of the defendants revoking the plaintiff's license to serve as a mortgage lender in Connecticut, brought to the Superior Court in the judicial district of New Britain and tried to the court, *Cordani, J.*; judgment dismissing the plaintiff's appeal, from which the plaintiff appealed. *Affirmed.*

*Ross H. Garber*, with whom were *Seth R. Klein* and, on the brief, *Craig A. Raabe*, for the appellant (plaintiff).

*Patrick T. Ring*, assistant attorney general, with whom were *Joseph J. Chambers*, deputy associate attorney general, and, on the brief, *William Tong*, attorney general, and *John Langmaid*, assistant attorney general, for the appellees (defendants).

*Opinion*

McDONALD, J. This appeal requires us to consider, for the first time, the statutory scheme governing the suspension and revocation of a mortgage lender license. The plaintiff, 1st Alliance Lending, LLC, appeals from the judgment of the trial court dismissing its appeal from the decision of the defendant Jorge Perez, the Commissioner of Banking, revoking the plaintiff's license to serve as a mortgage lender in the state. The principal issue on appeal is whether General Statutes § 36a-492 and the relevant statutory scheme granted the commissioner the legal authority to suspend and revoke the plaintiff's mortgage lender license. We conclude that they did and, accordingly, affirm the judgment of the trial court.

The record reveals the following undisputed facts and procedural history. The commissioner, acting through the named defendant, the Department of Banking, is statutorily authorized to license and regulate the residential mortgage loan industry in Connecticut. See General Statutes §§ 36a-485 through 36a-534b. The plaintiff has been licensed by the commissioner as a mortgage lender in Connecticut for many years. During the period of time relevant to this matter, the plaintiff and the department were engaged in an enforcement proceeding, initiated by the commissioner in 2018, concerning the revocation of the plaintiff's license for reasons separate from and not relevant to this appeal. Although the substance of the allegations in that proceeding is not at issue in this appeal, the existence of that ongoing administrative enforcement proceeding is relevant.

One of the requirements for maintaining a mortgage lender license is that the mortgage lender maintain a surety bond. See General Statutes §§ 36a-488 (b) and 36a-492. The plaintiff's surety bond was issued by the Hartford Fire Insurance Company (The Hartford). In May, 2019, The Hartford issued a notice of cancellation of the plaintiff's surety bond, stating that the bond would be cancelled, effective July 31, 2019. The notice stated that the bond permitted The Hartford, as the surety, to terminate its suretyship by serving notice of its election to do so on the department, as the obligee. The Hartford sent notice of the cancellation to both the plaintiff, as the principal on the bond, and the department, as it was required to do by law. See General Statutes § 36a-492 (c). After receiving The Hartford's notice of cancellation, Amy Grillo, an administrative assistant employed by the department, created a routine entry in the Nationwide Mortgage Licensing System and Registry (NMLS),[1] stating that the notice of cancellation, effective July 31, 2019, had been received, and that the failure to replace or reinstate the bond would result in an automatic suspension and revocation of the plaintiff's mortgage lender license. Grillo also sent an e-mail

to Heather Sanchez, the plaintiff's chief compliance officer. Attached to the e-mail was a letter, dated June 7, 2019, stating that § 36a-492 required the plaintiff to maintain a surety bond running concurrently with the period of the license for the plaintiff's main office, and that the plaintiff's failure to have a bond in effect on July 31, 2019, would result in the commissioner's automatic suspension of the plaintiff's license and inactivation of the licenses of each Connecticut mortgage loan originator sponsored by the plaintiff. The June 7 letter went on to state, in relevant part, that, "[i]n order to avoid these outcomes, you must submit a letter of reinstatement of the bond from [The Hartford] or a new bond from a surety company, providing for an effective date on or prior to the bond cancellation effective date [of July 31, 2019], or cease doing business and surrender the license on the [NMLS] in accordance with [General Statutes §§] 36a-51 (c) and 36a-490 . . . ." The June 7 letter further stated that, "[i]n the event of automatic suspension," the commissioner shall provide the required notice and an opportunity for a hearing. The June 7 letter concluded by stating that, "if you fail to address this issue," the letter serves as notice required by General Statutes § 4-182 (c) and "provides you an opportunity to show compliance with all lawful requirements for the retention of your license." The June 7 letter was signed by a director of the department, on behalf of the commissioner.

Upon receipt of The Hartford's notice of cancellation and the department's June 7 letter, the plaintiff's chief executive officer, John DiIorio, considered the plaintiff's options. The plaintiff, however, did not immediately respond to the department's June 7 letter, and, approximately one month after the issuance of that letter, Grillo sent a follow-up e-mail to Sanchez, reminding her of the June 7 letter, notifying her about the bond requirements, and requesting a response. The same day, DiIorio sent Grillo an e-mail, acknowledging receipt of the June 7 letter and representing that the plaintiff was considering its options, understood the relevant deadline, and would communicate its plan to the department prior to the close of business on July 30, 2019.

The plaintiff explored the option of obtaining a replacement surety bond but, on or about July 22 or 23, 2019, ultimately decided to cease doing business in Connecticut and to surrender its license. The plaintiff did not communicate its intention to the department until several days later. More precisely, on July 29, 2019, DiIorio sent an e-mail to Grillo, stating that the plaintiff "is voluntarily surrendering its license. Our licensing manager will enter the information into [the] NMLS before [close of business on July 31, 2019]. The active pipeline contains no Connecticut consumers. Please confirm receipt of this message by reply e-mail."

The commissioner did not accept the plaintiff's pur-

ported surrender of its license, and, days later, on July 31, 2019, Grillo made an online entry in the NMLS reflecting that the plaintiff's mortgage lender license was suspended. The next day, the commissioner issued the plaintiff a Notice of Automatic Suspension, Notice of Intent to Revoke Mortgage Lender License, and Notice of Right to Hearing. Through the notices, the commissioner informed the plaintiff that its mortgage lender license was automatically suspended on July 31, 2019, and apprised the plaintiff that it could request an administrative hearing on the allegations contained in the notices. The plaintiff requested a hearing, which was held in September, 2019. Following the hearing, the commissioner upheld the suspension. The commissioner also concluded that, pursuant to General Statutes § 36a-494, the plaintiff's failure to maintain a surety bond, as required by § 36a-492, supported the revocation of the plaintiff's mortgage lender license. Accordingly, the commissioner ordered the revocation of the plaintiff's mortgage lender license. The suspension and revocation had national ramifications for the plaintiff because they hampered its ability to conduct business in other states and could result in "a series of cross-defaults with other counterparties and [other] revocations." A properly effectuated surrender would not have had these negative ramifications.

The plaintiff filed an administrative appeal from the commissioner's decision with the trial court, pursuant to the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq. See General Statutes § 4-183. The plaintiff argued, among other things, that the governing statutory scheme precluded the department from suspending its license, and that the department should be bound by the plain meaning of its June 7 letter. Following a hearing and postargument briefs, the trial court issued a memorandum of decision, affirming the commissioner's decision and dismissing the plaintiff's appeal. The trial court concluded that (1) the commissioner did not abuse his discretion in declining to accept the plaintiff's license surrender, (2) the June 7 letter did not constitute an offer from the defendants for the plaintiff to surrender its license, and, therefore, the commissioner was not compelled to accept the plaintiff's license surrender under contract principles, and (3) the commissioner was not estopped from declining to accept the plaintiff's license surrender because there was no representation or promise by the commissioner on which the plaintiff could have reasonably relied. This appeal followed.

On appeal, the plaintiff contends that the governing statutes do not permit the defendants to suspend the plaintiff's license. Failing that, the plaintiff further contends that, even if the relevant statutes gave the defendants discretion to suspend its license, the trial court incorrectly concluded that the commissioner lawfully exercised his discretion. Finally, the plaintiff also con-

tends that the defendants were estopped from suspending the plaintiff's license.

"We begin by articulating the applicable standard of review in an appeal from the decision of an administrative agency. Judicial review of [an administrative agency's] action is governed by the [UAPA] . . . and the scope of that review is very restricted. . . . With regard to questions of fact, it is neither the function of the trial court nor of this court to retry the case or to substitute its judgment for that of the administrative agency. . . . Judicial review of the conclusions of law reached administratively is also limited. The court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts." (Citations omitted; internal quotation marks omitted.) *Celentano* v. *Rocque*, 282 Conn. 645, 652, 923 A.2d 709 (2007). "Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . We have determined, therefore, that the traditional deference accorded to an agency's interpretation of a statutory term is unwarranted when the construction of a statute . . . has not previously been subjected to judicial scrutiny [or to] . . . a governmental agency's time-tested interpretation . . . ." (Internal quotation marks omitted.) *Pasquariello* v. *Stop & Shop Cos.*, 281 Conn. 656, 663, 916 A.2d 803 (2007). Whether the relevant statutory scheme granted the commissioner the legal authority to suspend and revoke the plaintiff's mortgage lender license is a question of statutory interpretation over which our review is plenary. See, e.g., *LaFrance* v. *Lodmell*, 322 Conn. 828, 833–34, 144 A.3d 373 (2016). We review § 36a-492 and the relevant statutory scheme in accordance with General Statutes § 1-2z and our familiar principles of statutory construction. See, e.g., *Sena* v. *American Medical Response of Connecticut, Inc.*, 333 Conn. 30, 45–46, 213 A.3d 1110 (2019).

We have never had occasion to consider the statutory scheme governing the suspension and revocation of a mortgage lender license. Accordingly, a review of the relevant statutes is foundational to our analysis. The plaintiff does not dispute that, in order to engage in the business of mortgage lending in Connecticut, it was required to maintain a surety bond. Specifically, General Statutes (Rev. to 2019) § 36a-486 (a) prohibits a limited liability company, or other "person," from making residential mortgage loans unless that company has first obtained a license from the commissioner. Section 36a-488 sets forth the conditions for obtaining and main-

taining a license, and, more specifically, subsection (b) of that statute requires the mortgage lender to maintain a surety bond, as specified in § 36a-492. See General Statutes § 36a-488 (b).

Section 36a-492 sets forth the requirement for maintaining a surety bond; General Statutes § 36a-492 (a); permits the surety company to cancel the surety bond at any time, provided it complies with certain notice requirements; General Statutes § 36a-492 (c); and provides for the automatic suspension of a license in the event of surety bond cancellation. General Statutes § 36a-492 (c). In particular, subsection (c) provides in relevant part: "The commissioner *shall automatically suspend* the licenses of a mortgage lender . . . on such date [of bond cancellation] . . . . *No automatic suspension . . . shall occur if*, prior to the date that the bond cancellation shall take effect, (1) the principal submits a letter of reinstatement of the bond from the surety company or a new bond, [or] (2) the mortgage lender . . . has ceased business and has surrendered all licenses *in accordance with subsection (a) of section 36a-490* . . . ." (Emphasis added.) General Statutes § 36a-492 (c).

We have explained that, "[i]n interpreting statutory text, this court has often stated that the use of the word shall, though significant, does not invariably create a mandatory duty. . . . The usual rule, however, is that [t]he . . . use of the word shall generally evidences an intent that the statute be interpreted as mandatory." (Internal quotation marks omitted.) *Dept. of Transportation* v. *White Oak Corp.*, 332 Conn. 776, 785, 213 A.3d 459 (2019). "The fact that [a statute] uses the term 'shall' in conjunction with the term 'unless' provides further support for our understanding that it creates a mandatory obligation on the part of the [agency] . . . ." Id. "The test to be applied in determining whether a statute is mandatory or directory is whether the prescribed mode of action is the essence of the thing to be accomplished, or in other words, whether it relates to a matter of substance or a matter of convenience. . . . If it is a matter of substance, the statutory provision is mandatory." (Internal quotation marks omitted.) Id., 786. Although the relevant language in § 36a-492 (c) does not contain the word "unless," the legislature did use the word "if," and we see no functional difference as to the mandatory nature of the obligation because the statutory provision establishes the procedure the commissioner must follow regarding the automatic suspension of a mortgage lender license unless, prior to the surety bond cancellation date, the mortgage lender either (1) obtains a letter of reinstatement or a new bond, or (2) ceases doing business in Connecticut and surrenders its license in accordance with § 36a-490 (a). The legislature's use of the words "automatically" and "automatic" reinforces the mandatory nature of the obligation. See, e.g., Webster's Third New International

Dictionary (2002) p. 148 (defining "automatically" as "in an automatic manner" or "without thought or conscious intention"); see also, e.g., id. (defining "automatic" as, among other things, "involuntary either wholly or to a major extent so that any activity of the will is largely negligible"). Moreover, the authority to suspend a mortgage lender license goes to an essential aspect of the commissioner's duty to license and regulate the residential mortgage loan industry in Connecticut. See generally General Statutes §§ 36a-485 through 36a-534b. Thus, we conclude, and the plaintiff does not dispute, that the use of the word "shall" in § 36a-492 (c) is mandatory, and, as a result, the commissioner is statutorily required to suspend a mortgage lender license in the event of surety bond cancellation unless the mortgage lender satisfies one of the two exceptions to the requirement of automatic suspension.[2]

There is no dispute that, in this case, the plaintiff did not obtain a letter of reinstatement from The Hartford or a new surety bond. Thus, the commissioner was required to suspend the plaintiff's license, pursuant to § 36a-492 (c), unless the plaintiff ceased doing business in Connecticut and effectively surrendered its license in accordance with § 36a-490 (a). In order to effectively surrender its license, a mortgage lender must request permission to surrender its license. Specifically, § 36a-490 (a) (1) provides in relevant part: "Any licensee who intends to permanently cease engaging in the business of making residential mortgage loans . . . at any time during a license period for any cause . . . shall file a *request* to surrender the license for each office at which the licensee intends to cease to do business, on the system, not later than fifteen days after the date of such cessation . . . . *No surrender shall be effective until accepted by the commissioner*." (Emphasis added.) As a result, a mortgage lender may *request* to surrender its license but the surrender is effective only upon the commissioner's acceptance of it.

Important to the present case, § 36a-51 further restricts a mortgage lender's ability to surrender its license when that lender is subject to an ongoing administrative enforcement action by the commissioner. Specifically, "[i]f . . . *prior to the filing of a request to surrender a license, the commissioner has instituted a proceeding* to suspend, revoke or refuse to renew such license, such surrender or *request to surrender will not become effective except at such time and under such conditions as the commissioner by order determines*."[3] (Emphasis added.) General Statutes § 36a-51 (c) (1).

In short, whenever a mortgage lender wants to surrender its license, it must request to surrender it. In the event of an ongoing administrative enforcement proceeding, the request is not effective except at the time and under the conditions the commissioner deter-

mines. In all other situations, the surrender is not effective until accepted by the commissioner. In either circumstance, the commissioner is always required to take some action before the surrender of the license is effective. Indeed, given that both §§ 36a-490 and 36a-51 use the word "request," it is clear that the statutory scheme does not contemplate a unilateral surrender on behalf of the mortgage lender. See, e.g., The American Heritage College Dictionary (4th Ed. 2007) p. 1182 (defining "request" as "[t]o express a desire for" or to "ask for"); Ballentine's Law Dictionary (3d Ed. 1969) p. 1098 (defining "request" as "[t]o ask or express a wish for something").

With this statutory scheme in mind, we turn to the facts of this case to determine whether the plaintiff effectively surrendered its license in accordance with §§ 36a-490 and 36a-51. Two days before its surety bond was set to be cancelled, the plaintiff sent an e-mail to the department, stating that it was "voluntarily surrendering its license." In the proceedings before the department's hearing officer, the plaintiff, through its counsel and officers, repeatedly emphasized that it had not submitted a *request to surrender* its license, as required by §§ 36a-490 (a) and 36a-51, but, rather, had *surrendered* the license. For example, during his opening statement before the hearing officer at the department's hearing, the plaintiff's counsel stated that "[the June 7] letter does not talk about offering to surrender [the plaintiff's] license; that letter does not talk about the [commissioner's] needing to take a separate step of accepting an offer of a surrender. . . . Prior to the expiration of the bond, [*the plaintiff*] *surrendered its license*; [*it*] *didn't offer to surrender its license, it surrendered its license to the department* . . . ." (Emphasis added.) DiIorio testified that the department "offered us to cease business and surrender our license—*not offer to surrender, surrender our license*—which we did." (Emphasis added.) Similarly, during his closing argument at the hearing, the plaintiff's counsel explained: "[T]he statutes say what they say. The statutes do talk about an offer to surrender a license. The June 7 letter, on the other hand, doesn't talk about an offer at all. The June 7 letter talks about a surrender. Not an offer to surrender, a surrender. . . . And, specifically, you heard testimony that [the plaintiff] did what the letter instructed that it could do." As we discuss later in this opinion, the plaintiff's argument at the department hearing failed to acknowledge that the June 7 letter expressly stipulated that, should the plaintiff want to surrender its license and cease doing business in this state, it had to do so "in accordance with [§§] 36a-51 (c) and 36a-490 . . . ." These statutory provisions clearly establish that no surrender or request to surrender is effective until accepted by the commissioner. Thus, the plaintiff freely admits that it failed to properly submit a request to surrender to the department.

Even if we assume that DiIorio's e-mail was a request to surrender, there is no evidence in the record that the commissioner accepted the surrender. See General Statutes § 36a-490 (a) (1). Moreover, given the ongoing 2018 enforcement proceeding concerning the revocation of the plaintiff's license for reasons separate from this surety bond issue, the request to surrender did not become effective because the commissioner never set the time or conditions for the request to surrender. See General Statutes § 36a-51 (c) (1). As a result, even if the plaintiff properly submitted a *request* to surrender, the plaintiff failed to effectuate a surrender of its license before the effective date of its surety bond cancellation, and, therefore, the commissioner was statutorily required to suspend the plaintiff's mortgage lender license. See General Statutes § 36a-492 (c).

Following the suspension, the commissioner provided the plaintiff with an opportunity for a hearing, at which it could present evidence and make argument. In compliance with the procedures set forth in the UAPA, the hearing was held, and the plaintiff presented evidence and argued why its license should not be revoked. After considering the substantial evidence in the record, the commissioner revoked the plaintiff's mortgage lender license. Given that the failure to maintain the required surety bond is sufficient cause to revoke a mortgage lender license; see General Statutes § 36a-494 (a) (1) ("[t]he commissioner may . . . revoke . . . any mortgage lender . . . license . . . for any reason which would be sufficient grounds for the commissioner to deny an application for such license"); the commissioner appropriately revoked the plaintiff's mortgage lender license. See, e.g., *Board of Selectmen* v. *Freedom of Information Commission*, 294 Conn. 438, 453, 984 A.2d 748 (2010) ("[i]f the penalty meted out is within the limits prescribed by law, the matter lies within the exercise of the [agency's] discretion and cannot be successfully challenged unless the discretion has been abused" (internal quotation marks omitted)).

The plaintiff nevertheless maintains that the commissioner "had no legal discretion to suspend [the plaintiff's] license following [its] license surrender." This argument is unavailing for two reasons. First, it assumes that the plaintiff properly effectuated a surrender of its license. As we discussed, given that the commissioner never set the time or conditions for the surrender and never accepted the surrender, the plaintiff did not properly surrender its license before the expiration of the surety bond, and, therefore, the commissioner was statutorily required to suspend the plaintiff's license. The plaintiff's position that it effectively surrendered its license through its unilateral actions on July 29, 2019, ignores the plain language of § 36a-492 (c), which requires a mortgage lender to surrender its license "in accordance with subsection (a) of section 36a-490

. . . ." The plaintiff would have us read out the requirements of § 36a-490. We decline to do so. See, e.g., *Lopa* v. *Brinker International, Inc.*, 296 Conn. 426, 433, 994 A.2d 1265 (2010) ("[I]n construing statutes, we presume that there is a purpose behind every sentence, clause, or phrase used in an act and that no part of a statute is superfluous. . . . Because [e]very word and phrase [of a statute] is presumed to have meaning . . . [a statute] must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant." (Internal quotation marks omitted.)).

Second, to the extent that the plaintiff argues that the commissioner was without discretion not to accept the license surrender, we are not persuaded. The commissioner did not accept the request to surrender expressly because of the ongoing 2018 enforcement proceeding against the plaintiff. Section 36a-51 (c) (1) contemplates that, in the event of an ongoing administrative enforcement proceeding, the request to surrender itself "will not become effective except at such time and under such conditions as the commissioner by order determines." In other words, an ongoing enforcement proceeding precludes a request to surrender from taking effect upon submission, and the commissioner has discretion not to accept a request to surrender based solely on the fact that there is an ongoing enforcement proceeding. Indeed, the record reflects that it is standard practice at the department that a request to surrender will not be accepted until an ongoing enforcement action is resolved.[4]

The plaintiff also argues that the statutory scheme should not be interpreted to permit the department to decline to take action on a request to surrender, thereby creating a situation in which the lender has a license but no surety bond. In other words, the plaintiff contends, the department's own actions in failing to accept the license surrender created the licensing violation. Neither the plaintiff's brief, nor our independent research, however, indicates that the department is under any statutory or regulatory obligation to take action on a request to surrender within a time certain following receipt of the request. Moreover, in this case, there is no indication in the record that the department unreasonably delayed in taking action on the plaintiff's request; rather, it was the plaintiff that waited to submit its request to surrender until two days before its surety bond was set to be cancelled. After not receiving a response to its June 7 letter, the department even followed up with the plaintiff. The plaintiff was well aware of the ongoing 2018 enforcement proceeding and of the obligation to maintain a surety bond as long as it held a license. At any time following The Hartford's notice of cancellation, the plaintiff could have reached out to the department to discuss the time and conditions for a request to surrender. See General Statutes § 36a-51 (c) (1). The plaintiff failed to do so. To the extent that

the plaintiff wants to impose greater time constraints on the department's response to a request to surrender a mortgage license, its recourse is with the General Assembly, not this court. See, e.g., *Castro* v. *Viera*, 207 Conn. 420, 435, 541 A.2d 1216 (1988) ("[I]t is up to the legislatures, not courts, to decide on the wisdom and utility of legislation. . . . [C]ourts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws." (Internal quotation marks omitted.)).

Finally, the plaintiff contends that the trial court incorrectly determined that the department was not estopped from suspending and revoking the plaintiff's mortgage lender license based on the representations the department made in the June 7 letter. Specifically, the plaintiff argues that the plain language of the June 7 letter provided the plaintiff with three options to avoid license suspension, including permitting it to cease doing business in Connecticut and to surrender its license on the NMLS. The plaintiff further contends that it chose this option in specifically induced reliance on the June 7 letter. We have reviewed this claim and conclude that it is without merit. The June 7 letter was a form compliance letter required by § 4-182 (c), directing the plaintiff to comply with the applicable statutory provisions or risk losing its license. Despite the plaintiff's assertions to the contrary, the June 7 letter specifically provided that the plaintiff could "cease doing business and surrender the license on the [NMLS] *in accordance with* [§§] *36a-51 (c) and 36a-490* . . . ." (Emphasis added.) As we discussed, the plaintiff did not surrender its license in accordance with §§ 36a-51 (c) and 36a-490. The trial court thus correctly concluded that it was not reasonable for the plaintiff to interpret the June 7 letter as any type of promise, and it was not reasonable for the plaintiff to rely on the letter to the exclusion of the clearly applicable statutory scheme that was explicitly referenced in the letter. See, e.g., *A.C. Consulting, LLC* v. *Alexion Pharmaceuticals, Inc.*, 194 Conn. App. 316, 333–34, 220 A.3d 890 (2019) ("[i]t is axiomatic that to prevail on a claim of estoppel, it is not enough that a promise was made; reasonable reliance thereon, resulting in some detriment to the party claiming the estoppel, also is required" (emphasis omitted; internal quotation marks omitted)); see also, e.g., *Chotkowski* v. *State*, 240 Conn. 246, 268–69, 690 A.2d 368 (1997) ("estoppel against a public agency is limited and may be invoked . . . (1) only with great caution . . . (2) only when the action in question has been induced by an agent having authority in such matters . . . and (3) only when special circumstances make it highly inequitable or oppressive not to estop the agency" (internal quotation marks omitted)).

The judgment is affirmed.

In this opinion the other justices concurred.

* February 16, 2022, the date that this decision was released as a slip

opinion, is the operative date for all substantive and procedural purposes.

[1] The defendant's appellate brief notes that the NMLS is "a web based, multistate platform for regulatory agencies to administer initial license applications and ongoing compliance requirements of persons in the mortgage and other financial services industries." See, e.g., General Statutes § 36a-2 (70) (describing NMLS as "multistate system . . . for the licensing and registration of persons in the mortgage and other financial services industries").

[2] We note that, although mortgage lender licensing requirements throughout the United States have become more uniform in the wake of the Secure and Fair Enforcement for Mortgage Licensing Act of 2008 (SAFE Act), 12 U.S.C. § 5101 et seq., revocation and suspension of licenses remains largely state-specific. Cf. L. Wilson, "All Things Considered: The Contribution of the National Mortgage Licensing System to the Battle Against Predatory Lending," 24 Ga. St. U. L. Rev. 415, 419 (2007) ("[i]t is undeniable . . . that the [NMLS'] accommodation of jurisdiction-specific licensing requirements compromises the goal of uniformity for the license application and renewal forms"). The federal regulations that were issued to implement the SAFE Act require that states "maintain a loan originator licensing, supervisory, and oversight authority"; 12 C.F.R. § 1008.111 (a) (2021); and give states the authority "[t]o suspend, terminate, and refuse renewal of a loan originator license for violation of state or [f]ederal law . . . ." Id., § 1008.111 (b) (5). The applicable federal regulations also require that the supervisory authority created by the state "discipline loan originator licensees with appropriate enforcement actions, such as license suspensions or revocations . . . ." Id., § 1008.113 (a) (3). The SAFE Act and the applicable federal regulations do not, however, provide specific guidance regarding each state's regulatory scheme. Nevertheless, at least two states' statutory schemes closely resemble our revocation and suspension statutory scheme. Although our research has not revealed any cases in those states interpreting their statutes, both statutory schemes also require suspension of a mortgage lender license in the event of surety bond cancellation. See N.J. Stat. Ann. § 17:16F-34 d. (West Cum. Supp. 2020) ("[t]he commissioner shall suspend the license of a mortgage servicer on [the date of surety bond cancellation]" unless lender obtains reinstatement of its bond or new bond or ceases doing business in state and effectively surrenders its license); Haw. Rev. Stat. § 454M-4 (*l*) (Cum. Supp. 2019) ("[t]he commissioner shall automatically suspend the license of a mortgage servicer on [the date of surety bond cancellation]" unless lender obtains reinstatement of bond or new bond or ceases doing business in state and effectively surrenders its license).

[3] Although neither party draws our attention to it, we note that § 36a-51 (c) (1) references both a "surrender or request to surrender . . . ." We have previously explained that "[t]he use of the different terms . . . within the same statute suggests that the legislature acted with complete awareness of their different meanings . . . and that it intended the terms to have different meanings . . . ." (Internal quotation marks omitted.) *Felician Sisters of St. Francis of Connecticut, Inc.* v. *Historic District Commission*, 284 Conn. 838, 850, 937 A.2d 39 (2008). Section 36a-51 (c) (1) also explains, however, that, "in the case of a license issued through the system, as defined in section 36a-2, such surrender shall be initiated by filing a request to surrender on the system. No surrender on the system shall be effective until the request to surrender is accepted by the commissioner." The "system" is defined as the NMLS. See General Statutes § 36a-2 (70). In this case, subdivision (1) of § 36a-51 (c) requires a request to surrender because the plaintiff's mortgage lender license was issued through the NMLS. See General Statutes § 36a-488.

[4] The defendants contend that permitting a mortgage lender that is subject to an ongoing enforcement action to unilaterally surrender its license without terms or conditions would frustrate the legislative intent of the statutory scheme by allowing the lender to avoid the consequences of its wrongful conduct. The plaintiff contends that surrendering its license would not have any impact on an ongoing enforcement proceeding because § 36a-51 (c) (1) provides in relevant part that "[s]urrender of a license shall not affect the licensee's civil or criminal liability, or affect the commissioner's ability to impose an administrative penalty on the licensee pursuant to section 36a-50 for acts committed prior to the surrender. . . ." Given that the statutory scheme does not permit the unilateral surrender on the part of a mortgage lender, and that, in the event of an ongoing enforcement proceeding, a request to surrender is effective only at the time and under the conditions the commissioner sets, we need not decide the effect that such a unilateral

surrender would have on an ongoing enforcement proceeding. We note, however, that, although General Statutes § 36a-50 permits the imposition of a civil penalty, it does not appear to provide for license revocation. It is logical that the legislature would have created a statutory scheme that encourages—indeed requires—residential mortgage lenders to comply with all statutory requirements, even as a lender is faltering, thereby protecting Connecticut borrowers. It is precisely when a lender is facing difficulties, for whatever reason, that it is most important that a lender not simply be able to unilaterally surrender its license.

---