# GENCONN ENERGY, LLC *v.* PUBLIC UTILITIES REGULATORY AUTHORITY
## (SC 20716)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Alexander and Moll, Js.

*Syllabus*

Pursuant to statute (§ 16-243u), "in an annual retail generation rate contested
case," a peaking generation facility "shall be entitled to recover its
prudently incurred costs," and the Public Utilities Regulatory Authority
(PURA) "shall review such recovery of costs consistent with the princi-
ples set forth in sections 16-19, 16-19b and 16-19e . . . ."

Pursuant further to statute (§ 16-19e (a) (4)), PURA shall examine and review
a peaking generation facility's recoverable costs to ensure "that the level
and structure of rates be sufficient, but no more than sufficient," to
cover the facility's operating costs.

The plaintiff electric supplier, G Co., appealed to the trial court from the
final decision of the defendant, PURA, which reduced G Co.'s proposed
return on capital with respect to two of G Co.'s peaking generation
facilities that were designed to provide additional electric supply to
Connecticut consumers at times of increased demand. G Co., as a peak-
ing generation provider, is required to submit its Annual Fixed Revenue

348 Conn. 532     FEBRUARY, 2024     533

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

Requirements application (application) to PURA every year to set out the recoverable capital it seeks for the upcoming year. In determining the allowable recoverable capital, PURA first determines the peaking generation facility's rate base, which represents the value of the property on which the facility is permitted to earn a rate of return. The rate base is then divided based on the debt-to-equity ratio to find the portion of the rate base that is attributable to each. Finally, the portion of the rate base that is attributable to debt and the portion that is attributable to equity are multiplied by the applicable rate to find the total amount the facility should be allowed to recover. For each of G Co.'s applications for 2010 through 2020, it sought and was allowed to recover, as part of the recoverable capital, its actual annual financing costs. When G Co. submitted its 2021 application, PURA concluded that G Co. was not entitled to recover the entire $8.573 million actual interest expense and determined that a reduction was warranted. PURA found that there were certain inaccuracies in both the debt-to-equity ratio and the debt rate proposed by G Co., and that G Co.'s miscalculations would lead to an overrecovery of costs. PURA's solution was to maintain G Co.'s proposed debt-to-equity ratio but to reduce the debt rate, ultimately reducing G Co.'s recoverable capital by approximately $2.861 million. According to PURA, this result would be more in line with the recovery contemplated by § 16-19e (a) (4), in that the rates paid by consumers would be "sufficient, but no more than sufficient," to cover G Co.'s capital costs. PURA therefore approved G Co.'s 2021 application but only authorized a return on interest of approximately $5.712 million rather than the $8.573 million that G Co. sought. The trial court rendered judgment dismissing G Co.'s administrative appeal, concluding that PURA was authorized to adjust G Co.'s overall recovery as it did. On appeal from the trial court's judgment, G Co. claimed, inter alia, that § 16-243u required PURA to use the statute's specific rate-making methodology applicable to peaking generation and not the general rate-making principles found in § 16-19e, and that the plain language of § 16-243u did not give PURA the authority to lower the recovery of G Co.'s actual annual financing costs. *Held*:

1. The trial court correctly determined that PURA had acted within its statutory authority to lower G Co.'s debt rate in its decision on G Co.'s 2021 application, PURA having acted pursuant to its authority under § 16-243u when it reviewed G Co.'s recovery of costs consistent with the general rate-making principles of § 16-19e:

Because § 16-243u incorporates § 16-19e by reference, the plain meaning of § 16-243u must be determined by considering § 16-19e alongside of it, and, when the two statutes are considered together, it is clear that § 16-243u directs PURA to review a peaking generation facility's recoverable costs pursuant to § 16-19e (a) (4) to ensure that the rates are "suffi-

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

cient, but no more than sufficient,'' to allow a peaking generation facility to cover its operating costs.

Moreover, there was no merit to G Co.'s claim that § 16-243u's reference to § 16-19e authorizes PURA only to consider the principles in § 16-19e for the recovery of costs but not for the setting of rates, as cost recovery and rate setting are interrelated in that a peaking generation facility recovers its costs only through the setting of rates.

Furthermore, G Co.'s contention that PURA must allow a full recovery of costs for any costs that were previously deemed "prudent," without any additional evaluation, would render the language in § 16-243u requiring an "annual retail generation rate contested case" and a review by PURA of "recovery of costs consistent with the principles set forth in [§] . . . 16-19e" meaningless.

In addition, although it was undisputed that PURA previously determined that the interest costs that G Co. had incurred from a 2012 refinancing of its debt were prudent, PURA had the authority, under § 16-243u, to reevaluate and recharacterize costs that were previously deemed prudently incurred in a prior year and to determine that they nevertheless may not properly be recovered from consumers in a subsequent year.

There also was no merit to G Co.'s claim that PURA had violated the plain language of § 16-243u by preventing G Co. from recovering a reasonable rate of return on equity when it disallowed some of G Co.'s recovery of costs and thus effectively reduced the rate of return on equity to less than the amount on which the parties had previously agreed, as the reduction in G Co.'s recoverable capital resulted from a reduction in the debt rate rather than a reduction of the rate of return on equity, and, accordingly, PURA allowed a reasonable rate of return on equity pursuant to the same rate of return on equity that had previously been agreed on by the parties.

This court concluded that G Co.'s interpretation of the statutory scheme, if applied, would leave PURA powerless to fix excess recoveries, which would conflict with the plain meaning of § 16-243u and with the broad authority granted to PURA in § 16-19e to set rates.

2. PURA's action in lowering the debt rate in its decision on G Co.'s 2021 application after not doing so for more than one decade was not arbitrary and capricious, as the administrative record contained substantial evidence to support PURA's conclusion that a reduction in G Co.'s debt rate was necessary:

The evidence presented and examined by PURA provided a substantial basis from which PURA reasonably could infer that G Co. had sought an overrecovery of costs, that finding supported PURA's conclusion that an adjustment was necessary to ensure that the rates set by G Co. were,

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

pursuant to § 16-19e (a) (4), "no more than sufficient" to allow G Co. to recover its costs, and PURA provided an adequate and full explanation in both its final decision and subsequent briefs for the reasons behind the change.

(*One justice dissenting*)

Argued September 8, 2023—officially released February 27, 2024

*Procedural History*

Appeal from the decision of the defendant reducing the plaintiff's proposed return on capital with respect to certain peaking generation facilities, brought to the Superior Court in the judicial district of New Britain, where the court, *Klau, J.*, granted the motion to intervene filed by the Office of Consumer Counsel; thereafter, the court, *Cordani, J.*, rendered judgment dismissing the appeal, from which the plaintiff appealed. *Affirmed.*

*Jennifer M. DelMonico*, with whom were *Marilyn B. Fagelson* and, on the brief, *Proloy K. Das* and *Daniel J. Sorger*, for the appellant (plaintiff).

*Seth Hollander*, assistant attorney general, with whom were *Scott Muska*, general counsel, and, on the brief, *William Tong*, attorney general, for the appellee (defendant).

*Thomas H. Wiehl*, staff attorney, with whom were *William E. Dornbos*, legal director, and, on the brief, *Jessica Gouveia*, staff attorney, for the appellee (intervenor Office of Consumer Counsel).

*Opinion*

McDONALD, J. This case concerns the authority of the defendant, the Public Utilities Regulatory Authority (PURA), to review and set the rates for peaking generation facilities within the state. The plaintiff, GenConn Energy, LLC, operates two peaking generation facilities, which are designed to provide additional electric energy to Connecticut consumers at times of increased demand.

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

Each year, GenConn is required to submit an Annual Fixed Revenue Requirements (AFRR) application to PURA proposing the revenue that it believes is required to recover its allowed costs[1] and for it to receive a reasonable rate of return on equity. When GenConn submitted its 2021 AFRR application, PURA found, under the general rate-making principles of General Statutes § 16-19e, that GenConn sought to overrecover from electric ratepayers. As a result, PURA lowered GenConn's overall recovery of revenue to ensure that "the level and structure of rates be sufficient, but no more than sufficient, to allow public service companies to cover their operating costs . . . ." General Statutes § 16-19e (a) (4).

On appeal to this court, GenConn argues that the trial court erred in concluding that PURA had acted within its authority. GenConn contends that PURA acted outside the scope of its authority under General Statutes § 16-243u, which specifically addresses peaking generation facilities, when it applied the general rate-making principles from § 16-19e in adjusting Gen-Conn's recovery. GenConn also contends that PURA's change in methodology in evaluating the 2021 AFRR application was arbitrary and capricious. For its part, PURA contends that § 16-243u expressly affords it the authority to use the rate-making principles in § 16-19e, and, because it is statutorily obligated to review Gen-Conn's recovery each year, its decision to lower Gen-Conn's recovery was not arbitrary and capricious.[2] We

---

[1] The allowed recoverable costs include the projected capital costs, operations and maintenance costs, and administrative and general expenses. Capital costs include the cost of debt. See, e.g., *Federal Power Commission* v. *Hope Natural Gas Co.*, 320 U.S. 591, 603, 64 S. Ct. 281, 88 L. Ed. 333 (1944).

[2] The Office of Consumer Counsel (OCC) is an intervenor in this matter and, as such, filed a brief in this appeal. The OCC is an independent government agency designated by statute as the advocate for all consumers of the state's regulated electric, natural gas, water, and telecommunications utilities, as well as the customers of electric suppliers. See General Statutes § 16-2a (a). Section 16-2a (a) authorizes the OCC "to appear in and participate in any regulatory or judicial proceedings, federal or state, in which such

348 Conn. 532 FEBRUARY, 2024 537

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

conclude that § 16-243u authorized PURA to determine GenConn's recovery using the general rate-making principles found in § 16-19e and that the "change" in PURA's methodology does not constitute an arbitrary and capricious decision. Accordingly, we affirm the judgment of the trial court.

An overview of certain aspects of this state's electric supply industry and relevant statutes is necessary to understand the issues in this appeal. Historically, during times of peak demand, the state had to procure additional electricity from out-of-state providers to satisfy the demand of electric consumers within the state. See 50 S. Proc., Pt. 15, 2007 Sess., p. 5066, remarks of Senator Donald E. Williams, Jr. Importing electricity in this manner was expensive and resulted in higher prices for ratepayers year-round. See id. In 2007, in an effort to reduce electric rates for Connecticut consumers, the General Assembly passed No. 07-242 of the 2007 Public Acts (P.A. 07-242), titled "An Act Concerning Electricity and Energy Efficiency" (act). The purpose of the act was to encourage investment in peaking generation facilities by assuring investors that they would recover their costs. See 50 S. Proc., supra, pp. 4960–62, remarks of Senator John W. Fonfara. By incentivizing the development of these peaking generation facilities, the state would not have to purchase out-of-state electricity at a premium, thereby reducing the cost of electricity for Connecticut ratepayers. See id., p. 5066, remarks of Senator Williams. Section 50 of P.A. 07-242 provides in relevant part that, "[f]rom January 1, 2008, until February 1, 2008, any person may . . . submit a plan to build peaking generation . . . to be heard in a contested case proceeding before the Department of Public Utility

interests of Connecticut consumers may be involved . . . ." Unless otherwise noted, the arguments made by the OCC largely track those of PURA.

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

Control. . . .''[3] The act was later codified at General Statutes (Supp. 2008) § 16-243u, which provides that the selected peaking generators would fully recover the "prudently incurred costs" of the selected projects, including "capital costs, operation and maintenance expenses, depreciation, fuel costs, taxes and other governmental charges," as well as "a reasonable rate of return on equity." For the purposes of this opinion, the "prudently incurred costs" and the "reasonable rate of return on equity" referenced in § 16-243u will be referred to collectively as the "recoverable capital."

With this background in mind, we turn to the facts and procedural history specific to this case. In February, 2008, GenConn submitted a proposal to PURA with multiple options to construct peaking generation facilities. Included in the proposal were options to construct facilities in the Devon neighborhood of Milford and in Middletown. PURA ultimately selected GenConn to develop, finance, and construct both facilities. The Devon facility became operational in June, 2010, and the Middletown facility became operational in June, 2011. The initial capitalization for GenConn's facilities was 50 percent equity and 50 percent debt.[4] Then, in June, 2012, as required by PURA,[5] GenConn applied to

---

[3] The Department of Public Utility Control is PURA's predecessor. See Public Acts 2011, No. 11-80, § 1; see also, e.g., *Kleen Energy Systems, LLC* v. *Commissioner of Energy & Environmental Protection*, 319 Conn. 367, 370 n.1, 125 A.3d 905 (2015). For convenience, we hereafter refer to the Department of Public Utility Control as PURA.

[4] The "capitalization" or "capital structure" is a representation of how the facility has financed its investment. Federal Energy Regulatory Commission, Cost-of-Service Rates Manual (1999) p. 15, available at https://www.ferc.gov/sites/default/files/2020-08/cost-of-service-manual.pdf (last visited February 20, 2024). It is represented as a ratio of debt to equity. See id. "For example, a [generator that] has financed its investment with $6 million debt and $4 million in common equity, is referred to as having a 60 [percent]/40 [percent] debt-equity capitalization ratio." Id. "A utility's capital structure is used as a basis in determining the overall rate of return on a utility's investment." *In re Zia Natural Gas Co.*, 128 N.M. 728, 731, 998 P.2d 564 (2000).

[5] PURA's criteria decision, which established the criteria that would be used to "evaluate the proposals" to build the peaking generation facilities,

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

refinance its outstanding debt, which at the time totaled $236.5 million. PURA approved the refinance, which had a coupon rate of 4.73 percent.[6] The interest expense for this refinancing is amortized and fixed each year from 2013 through 2041. The actual interest expense for the refinancing in 2021 was $8.573 million.

GenConn, as a peaking generation provider, is required to submit its AFRR application to PURA each year to set out the recoverable capital it seeks for the upcoming year. In determining the allowable recoverable capital, PURA first determines the rate base for the peaking generation facility. The rate base represents the total investment of the generation facility, or, in other words, the value of the property on which the facility is permitted to earn a rate of return. See Federal Energy Regulatory Commission, Cost-of-Service Rates Manual (1999) pp. 8–9, 15, available at https://www.ferc.gov/sites/default/files/2020-08/cost-of-service-manual.pdf (last visited February 20, 2024). The rate base is then divided based on the debt-to-equity ratio to find the portion of the rate base that is attributable to each. In the present case, PURA and GenConn agreed that the 2021 rate base was $225.315 million, and, because GenConn had put forth a 50 percent/50 percent debt-to-equity ratio, the rate base for both debt and equity was approximately $112.658 million. The portion of the rate base that is attributable to debt and the portion that is attributable to equity are then multiplied by the applicable rate—in this case, GenConn sought a debt rate of 7.61 percent and an equity rate of 9.85 percent—to find the total amount the facility should be allowed to recover (recoverable capital).[7]

provides that all refinancings sought by a peaking generation facility "will be required to be approved by [PURA]."

[6] The coupon rate is the fixed interest rate of the loan.

[7] In the AFRR decision, PURA accepted GenConn's proposed rate of return on equity of 9.85 percent. In its decision, PURA stated that, "[p]ursuant to the [2007 criteria decision], GenConn is permitted a [return on equity] determined by the average of The Connecticut Light and Power Company's

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

For each of GenConn's AFRR applications for 2010 through 2020, it sought and was allowed to recover, as part of the recoverable capital, its actual annual financing costs, which included interest on its long-term and short-term debt. When GenConn submitted its 2021 AFRR application, it sought to recover the $8.573 million actual interest expense for the 2021 refinancing. PURA disagreed that GenConn was entitled to recover the entire actual interest expense for 2021 and determined that a reduction was warranted.

PURA concluded that there were inaccuracies in both the debt-to-equity ratio and the debt rate proposed by GenConn. Regarding the debt-to-equity ratio, PURA found that GenConn had incorrectly determined its debt-to-equity ratio to be 50 percent/50 percent based on its internal balance sheets, when the actual ratio was closer to 75 percent/25 percent. PURA based this finding on the fact that GenConn was financing its rate base with a debt of $172.485 million rather than with $112.658 million, as indicated by the rate base. Regarding the debt rate, PURA found that, although GenConn's coupon rate on its debt was only 4.73 percent, GenConn was calculating the proposed debt rate using the actual interest owed, $8.573 million, which represented the interest on the $172.485 million in debt rather than on the $112.658 million. This resulted in the higher debt rate of 7.61 percent proposed by GenConn.

PURA determined that the effect of the miscalculations by GenConn in its proposal would result in approval of recoverable capital appropriate for a rate base of

(Eversource Energy) and The United Illuminating Company's (UI) currently allowed [return on equities] plus 67.5 basis points. Neither Eversource Energy nor UI [has] had a rate proceeding since the 2020 AFRR [application]; hence, the [return on equity] base remains the same. Specifically, Eversource Energy has a [return on equity] of 9.25 [percent], and UI has a [return on equity] of 9.10 [percent]. The resulting average [return on equity] of 9.175 [percent] is added to 67.5 basis points for a total of 9.85 [percent]."

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

$285.143 million rather than the agreed $225.315 million rate base. The solution imposed by PURA was to keep GenConn's proposed 50 percent/50 percent debt-to-equity ratio but to reduce the debt rate from 7.61 percent to 5.07 percent,[8] ultimately reducing GenConn's recoverable capital by approximately $2.861 million. According to PURA, this result would be more in line with the recovery contemplated by § 16-19e (a) (4), in that the rates paid by customers would be "sufficient, but no more than sufficient," to cover GenConn's capital costs. PURA therefore approved GenConn's AFRR application but only authorized a return on interest of approximately $5.712 million rather than the $8.573 million requested by GenConn. It is this reduction that is at issue in this appeal.

GenConn appealed PURA's final decision, claiming that PURA was not authorized to lower GenConn's debt rate. The trial court dismissed the appeal after concluding that PURA was authorized to adjust GenConn's overall recovery as it did. GenConn appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court. On appeal, GenConn asks this court to overturn the trial court's decision on the grounds that it violates the plain meaning of § 16-243u to allow PURA to consider the rate-making principles in § 16-19e and that PURA's change in methodology after more than one decade of evaluating GenConn's AFRR applications constituted an arbitrary and capricious decision.

Judicial review of an administrative agency's determinations is governed by the Uniform Administrative Procedure Act, General Statutes § 4-166 et seq., and is ordinarily restricted in scope, with the court's "ultimate

---

[8] PURA found the 5.07 percent debt rate to be the "all-in cost of debt," explaining that this rate "accounts for the coupon rate of GenConn's long-term debt, recoverable fees and costs, and interest from short-term letter of credit (LOC) debt."

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

duty” being to decide, “in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion.” (Internal quotation marks omitted.) *Murphy* v. *Commissioner of Motor Vehicles*, 254 Conn. 333, 343, 757 A.2d 561 (2000). However, when a case presents a pure question of law, the court’s review of the agency’s decision is plenary. See, e.g., *1st Alliance Lending, LLC* v. *Dept. of Banking*, 342 Conn. 273, 280–81, 269 A.3d 764 (2022).

I

STATUTORY INTERPRETATION CLAIM

GenConn argues that the plain language of § 16-243u does not give PURA the authority to lower the recovery of GenConn’s actual annual financing costs. It asserts that § 16-243u requires PURA to use “the specific rate-making methodology applicable to peaking generation set forth [in § 16-243u]” and not “the general rate-making principles found in . . . § 16-19e.” PURA argues that the plain language of § 16-243u requires it to “review a peaking [generation] facility’s capital costs in accordance with traditional regulatory principles, including those set forth in § 16-19e.”

Whether § 16-243u authorizes PURA to utilize the rate-making principles set forth § 16-19e is a question of statutory interpretation. Because neither party in this case argues that PURA’s interpretation has been time-tested or previously subjected to judicial scrutiny, “the traditional deference accorded to an agency’s interpretation . . . is unwarranted,” and, therefore, our review is plenary. (Internal quotation marks omitted.) *1st Alliance Lending, LLC* v. *Dept. of Banking*, supra, 342 Conn. 280–81. Review of § 16-243u and the relevant statutory scheme must be in accordance with General Statutes § 1-2z and the familiar principles of statutory construction. See, e.g., *Sena* v. *American Medical*

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

*Response of Connecticut, Inc.*, 333 Conn. 30, 45–46, 213 A.3d 1110 (2019). The meaning of § 16-243u must, "in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes." General Statutes § 1-2z.

Section 16-243u sets forth the law applicable only to peaking generation facilities and provides in relevant part that a peaking generation facility "shall only recover the just and reasonable costs of construction of the facility and, in an annual retail generation rate contested case, shall be entitled to recover its prudently incurred costs of such project, including, but not limited to, capital costs, operation and maintenance expenses, depreciation, fuel costs, taxes and other governmental charges and a reasonable rate of return on equity. *The authority shall review such recovery of costs consistent with the principles set forth in sections* 16-19, 16-19b and *16-19e*, provided the return on equity associated with such project shall be established in the initial annual contested case proceeding under this section and updated at least once every four years. . . ." (Emphasis added.)

Section 16-19e, which is expressly referenced in the text of § 16-243u, sets forth general rate-making principles applicable to all energy generators in this state. It provides in relevant part that PURA "shall examine and regulate . . . the establishment of the level and structure of rates in accordance with the following principles . . . (4) that the *level and structure of rates be sufficient, but no more than sufficient, to allow public service companies to cover their operating costs including*, but not limited to, appropriate staffing levels, and capital costs, to attract needed capital and to maintain their financial integrity . . . (5) that the level and structure of rates charged customers shall reflect prudent and efficient management of the franchise operation . . . ." (Emphasis added.) General Statutes § 16-19e (a).

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

In short, § 16-243u provides in relevant part that a peaking generation facility "shall be entitled to recover its prudently incurred costs" and that "[t]he authority shall review such recovery of costs consistent with the principles set forth in sections 16-19, 16-19b and 16-19e . . . ." "As a general rule, [when] one statute specifically cites another statute, it is incorporating by reference the other statute, and the other statute must be considered in determining the plain language." 73 Am. Jur. 2d 251, Statutes § 13 (2023); see, e.g., *State* v. *Bemer*, 339 Conn. 528, 541–42, 262 A.3d 1 (2021) (when one statute explicitly referenced another, this court considered provisions of each in tandem to determine plain meaning under § 1-2z analysis). Section 16-243u incorporates § 16-19e by reference, and the plain meaning of § 16-243u must therefore be found by considering § 16-19e alongside it. In doing so, it is clear that § 16-243u directs PURA to review a peaking generation facility's recoverable costs to ensure that "the level and structure of rates be sufficient, but no more than sufficient, to allow public service companies to cover their operating costs . . . ." General Statutes § 16-19e (a) (4).

GenConn argues that § 16-243u references § 16-19e only to the extent that PURA may consider the principles in the latter statute for the recovery of costs but not the setting of rates. We agree with PURA that such a distinction fails to consider the interrelated nature of cost recovery and rate setting. In the energy field, rates are "set at a level designed to recover the company's prudently incurred costs, plus an adequate return on investment." Report of the State Commission Practice & Regulation Committee, 30 Energy L.J. 765, 769 (2009). In other words, "[o]nce a [peaking generation facility] establishes its revenue requirement, the [facility] must then spread the revenue requirement to several established classes of ratepayers, and set rates, based on

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

historical data, that the [facility] expects to generate its required revenue.'' *Commonwealth Edison Co.* v. *Illinois Commerce Commission*, 16 N.E.3d 713, 720 (Ill. App. 2014). GenConn's argument fails because a peaking generation facility recovers its costs through the setting of rates.

The plain meaning of § 16-243u, then, directs PURA to use the principles of § 16-19e in determining the generator's appropriate recoverable costs each year, and that amount is used to set the rates. To hold otherwise, as GenConn suggests—that PURA is authorized to look to § 16-19e only in determining the recovery of costs but must disregard that analysis in setting the rates—would lead to an absurd result. PURA determines the recoverable capital, which includes the recovery of costs and return on equity, in order to set the rates for the peaking generation facility. The facility can recover its costs only through the setting of rates. GenConn's interpretation of the statute would require PURA to determine the recoverable capital but then discard that number when setting the rates and instead set the rates using whatever costs had been deemed ''prudently incurred'' pursuant to § 16-243u. There would be no purpose, then, for PURA to determine the recovery of costs consistent with § 16-19e because it would serve no purpose in setting the rates. We decline to read the statutory scheme in a way that would lead to such an absurd result. See, e.g., *Raftopol* v. *Ramey*, 299 Conn. 681, 703, 12 A.3d 783 (2011) (court ''construe[s] a statute in a manner that will not . . . lead to absurd results'' (internal quotation marks omitted)).

Furthermore, GenConn's contention that PURA must allow a full recovery of costs for any costs that were previously deemed ''prudent,'' without any additional evaluation, would make the mandatory annual rate contested case required by § 16-243u meaningless. ''It is a basic tenet of statutory construction that the legislature

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

[does] not intend to enact meaningless provisions. . . . [I]n construing statutes, we presume that there is a purpose behind every sentence, clause, or phrase used in an act and that no part of a statute is superfluous. . . . Because [e]very word and phrase [of a statute] is presumed to have meaning . . . [a statute] must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant.'' (Internal quotation marks omitted.) *Lopa* v. *Brinker International, Inc.*, 296 Conn. 426, 433, 994 A.2d 1265 (2010). Section 16-243u provides in relevant part that there shall be an ''annual retail generation rate contested case . . . .'' It is this annual rate case that forecasts the recoverable costs for the upcoming year. If PURA had no power to review the recoverable capital at these annual rate cases and was merely required to allow recovery of any cost that had already been deemed prudent, there would be no purpose for the annual review. Moreover, such a construction would render the phrase in § 16-243u that ''[t]he authority shall review such recovery of costs consistent with the principles set forth in [§] . . . 16-19e,'' meaningless. Because we presume that the legislature had a purpose behind every phrase it includes in a statute, we decline to conclude that the legislature deemed an annual review necessary but intended that PURA have no authority to make determinations about a peaking generation facility's recovery based on that review.

GenConn advances two additional arguments in support of its contention that PURA's decision violates the plain language of § 16-243u. First, GenConn argues that PURA's decision ''illegally depriv[es] GenConn of its statutory right to recover prudently incurred costs.'' It reasons that, because PURA approved the 2012 refinancing of GenConn's debt as being in the best interest of consumers, the limitation set by § 16-243u, that only ''prudently incurred costs'' may be recovered, is fully

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

satisfied.[9] GenConn asserts that PURA's decision to the contrary creates a bizarre result because costs that were already "deemed prudently incurred" in 2008 and 2012 can "be reevaluated and potentially recharacterized as not prudently incurred on an annual basis" and essentially "reads [the directives about prudently incurred costs and return on equity] out of the statute," making it meaningless legislation.

In its brief, PURA clarified that it does not dispute that the interest costs that GenConn incurred from the 2012 refinancing were prudent but that "[t]he relevant question is whether PURA is authorized to determine the prudently incurred capital costs [*that*] *may be recovered from consumers* . . . ." (Emphasis added.) In other words, can a situation arise in which PURA deems a peaking generator's costs to be prudent at some point prior to the AFRR application, but then subsequently finds that the entire cost, though prudent, may nonetheless not be properly recovered from consumers? We conclude, based on the clear directives within § 16-243u, that PURA does have this authority. Section 16-243u sets out the categories of "prudently incurred costs" that the peaking generation facility is entitled to recover. It then explicitly states that this recovery of prudently incurred costs will be reviewed consistent with § 16-19e. See General Statutes § 16-243u. Therefore, although GenConn is correct in stating that § 16-243u allows it to recover its "prudently incurred costs,"

_____

[9] The dissent, accepting GenConn's invitation, also argues that the language of § 16-243u "indicates a mandatory entitlement" to recovery of GenConn's prudently incurred costs. As we explained in part I of this opinion, the relationship between §§ 16-243u and 16-19e is essential to understanding what power PURA has to adjust GenConn's recovery of costs. The language of § 16-243u directs PURA to review the recovery of prudently incurred costs consistent with the principles of § 16-19e, which, in turn, gives PURA the authority to set rates so that they are "no more than sufficient" to allow GenConn to "cover [its] operating costs . . . ." General Statutes § 16-19e (a) (4).

it ignores the subsequent sentence, which directs PURA to "review such recovery of costs" that may be recoverable from consumers according to § 16-19e. General Statutes § 16-243u.

Second, GenConn argues that PURA's decision violates the plain language of § 16-243u by preventing it from recovering a reasonable rate of return on equity. Section 16-243u provides in relevant part that a peaking generation provider "shall be entitled to recover . . . a reasonable rate of return on equity. . . ." The statute further provides in relevant part that the return on equity "shall be established in the initial annual contested case proceeding under this section and updated at least once every four years. . . ." General Statutes § 16-243u. The rate of return on equity proposed by GenConn and accepted by PURA for 2021 was 9.85 percent. GenConn argues that PURA, by disallowing some of GenConn's recovery of costs, reduced the rate of return on equity to less than 9.85 percent because GenConn now must "absorb the $2.861 million in direct costs that should have been recovered," resulting in "an effective rate of return [on equity] of 7.59 [percent] . . . ." This argument is unpersuasive. The rate of return on equity was not lowered by PURA. It is true that GenConn's recoverable capital is lower than what it requested in its AFRR application by a total of $2.861 million, but this is a result of a reduction in the debt rate. The rate of return on equity remains 9.85 percent, which, when multiplied by the portion of the rate base designated as equity ($112.658 million), totals a return of approximately $11 million. Simply because Gen-Conn's overall recoverable capital was lowered as a result of the reduction in the debt rate does not mean that the return on equity has been altered. See, e.g., *Duquesne Light Co.* v. *Barasch*, 488 U.S. 299, 312, 109 S. Ct. 609, 102 L. Ed. 2d 646 (1989) (discussing rate of return on equity as separate and distinct from total

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

overall return and noting that rate of return on equity can be one figure, while "overall return" may be lower one). PURA did not violate the plain language of § 16-243u because it allowed a reasonable rate of return on equity pursuant to the same rate of return that previously had been agreed on by the parties.

PURA and the Office of Consumer Counsel (OCC) also point out, and we agree, that GenConn's interpretation, if applied, would leave PURA powerless to fix excess recoveries, which would conflict with not only the plain meaning of § 16-243u, but also with the broad authority granted to PURA in § 16-19e to set rates. The OCC emphasizes the importance of PURA's "flexibility" in examining an AFRR application and notes that PURA must be able to do so "in light of the entire universe of facts and circumstances available to it . . . ." (Footnotes omitted.) PURA is "[statutorily charged] with ensuring that Connecticut's [investor owned] utilities, including the state's electric . . . companies, provide safe, clean, reliable, and affordable utility service and infrastructure." Public Utilities Regulatory Authority, Dept. of Energy & Environmental Protection, About PURA (2024), available at https://portal.ct.gov/PURA/About/About-PURA (last visited February 20, 2024). It is for this reason that § 16-243u directs PURA to review the peaking generation facility's recovery of costs consistent with § 16-19e to ensure that "the level and structure of rates be sufficient, but no more than sufficient, to allow public service companies to cover their operating costs . . . ." General Statutes § 16-19e (a) (4). Given this clear purpose, PURA must be able to protect the interests of ratepayers, and, when it determines that a company is overrecovering, it must be allowed to adjust the rates. Furthermore, this court has repeatedly held that PURA has broad authority to regulate electric utilities and to set rates. See, e.g., *Greenwich* v. *Dept. of Public Utility Control*, 219 Conn. 121, 126, 592 A.2d

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

372 (1991) ("[PURA's] enabling statute . . . evinces a legislative intent to rely on [PURA] to regulate and supervise public utilities, and to establish rates that are not unreasonable. . . . [W]e conclude that the language of the enabling statute is sufficiently flexible to permit [PURA] to create necessary policies, including rate equalization, to guide its rate-making decisions." (Footnote omitted.)). Indeed, the United States Supreme Court has repeatedly emphasized the importance of the discretion afforded to regulatory agencies. See, e.g., *Duquesne Light Co.* v. *Barasch*, supra, 488 U.S. 313 ("[w]e have never doubted that state legislatures are competent bodies to set utility rates"); *Minnesota Rate Cases*, 230 U.S. 352, 433, 33 S. Ct. 729, 57 L. Ed. 1511 (1913) ("[t]he rate-making power is a legislative power and necessarily implies a range of legislative discretion"); see also, e.g., *Permian Basin Area Rate Cases*, 390 U.S. 747, 767, 88 S. Ct. 1344, 20 L. Ed. 2d 312 (1968) (discussing broad responsibility given to regulatory agency and stating that "it must be free, within the limitations imposed by . . . statutory commands, to devise methods of regulation capable of equitably reconciling diverse and conflicting interests"). We see no reason, given the importance and purpose of PURA's regulatory authority, to change course now.

Accordingly, we conclude that PURA was within its authority afforded by § 16-243u to review GenConn's requested recovery of costs and to adjust the debt rate, thereby lowering GenConn's return on financing costs.[10]

[10] The dissent maintains that PURA was authorized to adjust GenConn's recovery through other mechanisms available to it. We note that we agree, as does PURA, that PURA likely could have reduced GenConn's recovery even more than it did in this case. Specifically, as the dissent suggests, PURA could have reduced GenConn's recovery by adjusting the debt-to-equity ratio and the debt rate. Such adjustments would have resulted in a recovery of around $14 million for GenConn, a recovery that is approximately $5.6 million less than that which was originally requested. Our disagreement with the dissent lies in its reading of § 16-243u as precluding PURA from adjusting the cost of debt to disallow an overrecovery, which we found to be an authorized action.

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

II

ARBITRARY AND CAPRICIOUS CLAIM

GenConn also contends that PURA's 2021 decision was "arbitrary and capricious" because it changed the methodology PURA had used for one decade in determining recovery for peaking generation facilities. In response to this contention, PURA explains that it first discovered GenConn's "rate-making artifice," which had led to one decade of overrecovery, in 2021. PURA argues that, after this discovery, it "fixed the problem" by adjusting GenConn's recovery to reflect "the just and reasonable capital costs allowable under traditional rate-making principles."

GenConn's claim that PURA's decision was arbitrary and capricious requires this court to determine whether there is "substantial evidence in the administrative record to support [PURA's] findings of basic fact and whether the conclusions drawn from those facts are reasonable." (Internal quotation marks omitted.) *Murphy* v. *Commissioner of Motor Vehicles*, supra, 254 Conn. 343. "An administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred." (Internal quotation marks omitted.) *Commissioner of Mental Health & Addiction Services* v. *Freedom of Information Commission*, 347 Conn. 675, 708, 299 A.3d 197 (2023). When an agency "has stated its reasons for its actions, the court should determine only whether the assigned grounds are reasonably supported by the record and whether they are pertinent to the considerations [that] the [agency] was required to apply under the . . . regulations." (Internal quotation marks omitted.) *R & R Pool & Patio, Inc.* v. *Zoning Board of Appeals*, 257 Conn. 456, 470, 778 A.2d 61 (2001).

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

We conclude that there is substantial evidence in the record to support PURA's final decision. The evidence presented and examined by PURA—the actual coupon rate of GenConn's debt, the agreed on rate base, the agreed on debt-to-equity ratio, and the actual debt-to-equity ratio as supported by GenConn's balance sheets—provides a substantial basis from which PURA reasonably inferred that GenConn sought an overrecovery of costs. See part I of this opinion. PURA's finding, in turn, supported its conclusion that an adjustment was necessary to ensure that the rates set by the agency were "no more than sufficient" to allow GenConn to recover its costs. General Statutes § 16-19e (a) (4). The evidence examined by PURA and reflected in the administrative record provides substantial support for both its findings of fact and subsequent action in lowering the debt rate.

Furthermore, PURA's "change in methodology" is not a failure to abide by its own rules but, rather, an attempt to protect ratepayers from bearing the financial burden of GenConn's overrecovery. PURA failed to notice the overrecovery that GenConn had benefited from in prior years by incorrectly increasing its debt rate, and, once PURA discovered the issue, course corrected. Moreover, even if we were to consider this change to be a failure by PURA to follow its own rules, PURA provides an adequate and full explanation in both its final decision and subsequent briefs for the reasons behind the change. See *R & R Pool & Patio, Inc.* v. *Zoning Board of Appeals*, supra, 257 Conn. 459–60. As such, PURA's action in lowering the debt rate after one decade of neglecting to do so can in no way be said to be arbitrary and capricious. See id., 470, 479–80. Rather, it avoids an unjust windfall on the part of GenConn at the ratepayers' expense.

## CONCLUSION

The trial court correctly determined that PURA acted within its statutory authority to lower GenConn's debt

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

rate in its 2021 AFRR decision. Specifically, we conclude that PURA acted pursuant to its authority under § 16-243u when it reviewed GenConn's recovery of costs consistent with the general rate-making principles of § 16-19e. We also conclude that, because the administrative record contains substantial evidence to support PURA's conclusion that a reduction in the debt rate was necessary, its decision does not constitute an arbitrary and capricious one.

The judgment is affirmed.

In this opinion ROBINSON, C. J., and D'AURIA, MULLINS, ALEXANDER and MOLL, Js., concurred.

ECKER, J., dissenting. I disagree with the majority's conclusion that the Public Utilities Regulatory Authority (PURA) acted within the scope of its authority under General Statutes § 16-243u when it applied the general rate-making principles of General Statutes § 16-19e to adjust the return on capital of GenConn Energy, LLC (GenConn). In my view, § 16-243u requires GenConn to recover its actual, prudently incurred cost of debt in full, a result that is wholly consistent with the principles of cost recovery set forth in § 16-19e. My analysis is based on the pertinent statutory text and is bolstered by two prior decisions of PURA and its predecessor, the Department of Public Utility Control (DPUC), that relate specifically to the project at issue and provide direct support for the conclusion that GenConn is entitled to recover its actual cost of prudently incurred debt.[1]

I hasten to add that my statutory analysis ultimately may leave GenConn in a worse position than does the

---

[1] Specifically, I rely on (1) PURA's final decision, dated December 23, 2020, on GenConn's 2021 Annual Fixed Revenue Requirements application, and (2) DPUC's criteria decision, dated December 14, 2007, setting forth how costs and debt would be reviewed by DPUC and recovered by peaking generators.

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

result reached by the majority. Although I do not believe that, on this record, PURA has discretion to deny Gen-Conn its prudently incurred cost of debt, the agency is not powerless to utilize other means to prevent Gen-Conn from obtaining an unfair and unjustified return on capital. More particularly, GenConn is entitled to recover its actual, prudently incurred cost of debt, but it cannot obtain an excessive return on capital. The issue in the present case, however, is limited to whether PURA is authorized by statute to regulate GenConn's return by denying the recovery of its actual, prudently incurred cost of debt. I would answer that question "no."

The majority and I agree that the text of § 16-243u controls the outcome of this case. In relevant part, the statute provides: "From January 1, 2008, until February 1, 2008, any person may, and an electric distribution company shall, submit a plan to build peaking generation, or the electric distribution companies may submit a joint ownership plan to build peaking generation, to be heard in a contested case proceeding before the Public Utilities Regulatory Authority. . . . Any plan approved by the authority shall . . . include a requirement that the owner of the peaking generation is compensated at cost of service plus reasonable rate of return as determined by the authority . . . . *Such person* shall only recover the just and reasonable costs of construction of the facility and, *in an annual retail generation rate contested case, shall be entitled to recover its prudently incurred costs of such project, including, but not limited to, capital costs, operation and maintenance expenses, depreciation, fuel costs, taxes and other governmental charges and a reasonable rate of return on equity. The authority shall review such recovery of costs consistent with the principles set forth in sections 16-19, 16-19b and 16-19e, provided the return on equity associated with such project*

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

*shall be established in the initial annual contested case proceeding under this section and updated at least once every four years. . . .*'' (Emphasis added.) General Statutes § 16-243u.

The only reasonable interpretation of this language entitles the generator to recover its prudently incurred cost of debt without reduction by PURA.[2] Several considerations lead me to this conclusion. First, the statute expressly provides that the generator ''shall be entitled to recover its prudently incurred costs [of debt],'' language that indicates a mandatory entitlement. General Statutes § 16-243u; see, e.g., *KeyBank, N.A.* v. *Yazar*, 347 Conn. 381, 392, 297 A.3d 968 (2023) (use of term ''shall'' in statute generally indicates mandatory requirement and will be interpreted as mandatory if prescribed action is matter of substance rather than convenience). Although ''shall'' can mean ''may'' if the statutory context reflects a permissive intention,[3] we can be certain that the legislature, in drafting § 16-243u, intended to use the word ''shall'' to mean something different from ''may'' because it used both words in the same statute in a manner demonstrating that it was acutely aware of their different meanings.[4] See, e.g., *Lostritto* v. *Com-*

___

[2] Capital costs include the cost of debt. See, e.g., *Federal Power Commission* v. *Hope Natural Gas Co.*, 320 U.S. 591, 603, 64 S. Ct. 281, 88 L. Ed. 333 (1944).

[3] See, e.g., *Statewide Grievance Committee* v. *Rozbicki*, 219 Conn. 473, 480–81, 595 A.2d 819 (1991) (noting that, ''in the interpretation of statutes the word shall may have a meaning that is directory rather than mandatory'' and that ''whether a statute is mandatory or directory [hinges on] whether the prescribed mode of action is the essence of the thing to be accomplished, or in other words, whether it relates to a matter of substance or a matter of convenience'' (internal quotation marks omitted)), cert. denied, 502 U.S. 1094, 112 S. Ct. 1170, 117 L. Ed. 2d 416 (1992).

[4] The first sentence of § 16-243u illustrates the point: ''From January 1, 2008, until February 1, 2008, any person *may*, and an electric distribution company *shall*, submit a plan to build peaking generation, or the electric distribution companies *may* submit a joint ownership plan to build peaking generation, to be heard in a contested case proceeding before the Public Utilities Regulatory Authority.'' (Emphasis added.)

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

*munity Action Agency of New Haven, Inc.*, 269 Conn. 10, 20, 848 A.2d 418 (2004).

None of this means that PURA must allow a generator to recover every documented cost of debt incurred in connection with such a project. To the contrary, § 16-243u is crystal clear that the generator is entitled to recover only "prudently incurred" costs. My disagreement with the majority lies with its conclusion that, *once costs are determined by PURA to be prudently incurred*, recovery may nonetheless be disallowed by PURA upon a finding that the costs, though prudently incurred, are somehow inconsistent with the principles set forth in § 16-19e. I read the statute to require recovery of actual costs determined by PURA to be prudently incurred. Because PURA concedes that the cost of debt at issue in the present case was actually and prudently incurred, GenConn is entitled to recover that cost as a matter of law.[5]

The majority reasons that, "[i]f PURA had no power to review the recoverable capital at these annual rate cases and was merely required to allow recovery of any cost that had already been deemed prudent, there would be no purpose for the annual review. Moreover, such a construction would render [meaningless the provision in § 16-243u requiring that] '[t]he authority shall review such recovery of costs consistent with the principles set forth in . . . [§] 16-19e' . . . ." Part I of the majority opinion. This argument refers to the fact that the relevant portion of § 16-243u contains two adjacent sentences, the first entitling the generator to recover its prudently incurred costs, the second requiring PURA

[5] To be clear, I do not contend that PURA is without authority to reduce the generator's debt *rate*, so long as the generator is allowed to recover its actual and prudently incurred cost of debt for the year at issue. Thus, in the present case, I agree that PURA did not act improperly when it decided to reduce GenConn's debt rate to 5.07 percent.

to review cost recovery consistent with the principles in § 16-19e.

Unlike the majority, I discern no tension that would compel us to choose between these two provisions by creating a category of prudently incurred costs under § 16-243u that nonetheless are inconsistent with (and therefore not recoverable under) the principles set forth in § 16-19e. Indeed, the majority never explains why the legislature would create such a category of costs. Nor does the majority identify any coherent principle that would justify disallowance of a cost that PURA has deemed prudently incurred within the meaning of § 16-243u. A far more cogent interpretation understands these two sentences to create a harmonious and complementary scheme under which prudently incurred costs are recoverable, with any question as to whether the costs are prudent to be resolved by PURA consistent with the principles set forth in the designated statutes. Once (as in the present case) the costs are deemed prudent, PURA can still use those principles to adjust a generator's return, so long as that adjustment permits recovery of the costs already deemed prudently incurred. This interpretation adheres most closely to the rule obligating courts to search for a construction that makes a harmonious whole of a statute's constituent parts. See, e.g., *Harpaz* v. *Laidlaw Transit, Inc.*, 286 Conn. 102, 130, 942 A.2d 396 (2008).

The majority's construction fares no better upon examination of the specific provisions of § 16-19e that it claims provide PURA the authority to deny GenConn's entitlement under § 16-243u to recover its prudently incurred cost of debt. The majority, following PURA's lead, locates PURA's authority in § 16-19e (a) (4) and (5), which authorize PURA to regulate "the level and structure of rates in accordance with the following principles . . . (4) that *the level and structure of rates be sufficient, but no more than sufficient, to allow public*

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

*service companies to cover their operating costs including,* but not limited to, appropriate staffing levels, and capital costs, to attract needed capital and to maintain their financial integrity . . . [and] (5) that the level and structure of rates charged customers shall reflect prudent and efficient management of the franchise operation . . . .'' (Emphasis added.)

The majority appears to assume that the applicability of these provisions to the particular circumstances of this case is self-evident, and it provides no explanation as to why or how the foregoing language allows PURA to deny recovery of GenConn's prudently incurred cost of debt under the framework established by § 16-243u. Section 16-19e (a) (4) requires PURA to ensure that the cost recovery ''be sufficient, but no more than sufficient, to allow [generators] to cover their . . . costs [of debt] . . . to attract needed capital and to maintain their financial integrity . . . .'' PURA has made no finding that permitting GenConn to recover its proposed cost of debt was somehow ''more than sufficient'' to cover the actual cost, to attract needed capital, or to maintain its financial integrity. To the contrary, all parties agree that the cost item at issue *is* a prudently incurred cost; indeed, the record indisputably demonstrates that PURA approved the refinancing precisely because the expenditure enabled GenConn to obtain needed capital in a manner that redounded to the benefit of ratepayers as well as the generator.[6]

The same analysis applies to § 16-19e (a) (5), which articulates the principle that rates reflect the ''prudent

---

[6] We can be certain that the level and structure of the rates that PURA approved in its final decision were insufficient to allow GenConn to cover its capital costs because recovery of its cost of debt was reduced below the $8,573,000 that both parties agree GenConn was required to pay to its lender in 2021. The ''financial integrity'' of GenConn plainly is not put at risk by allowing the cost recovery, and PURA never suggested otherwise. GenConn alleges that the opposite is true—its financial integrity was impaired by PURA's decision not to allow the cost recovery. General Statutes § 16-19e (a) (4).

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

and efficient management of the franchise operation
. . . .'' Again, there is no suggestion that the cost of
debt at issue manifested imprudent or inefficient man-
agement of the peaking generation facility. There is no
claim that GenConn's actual cost of debt increased at
any time after the refinancing—in fact, the cost was
lower than projected[7]—and PURA concedes that the
costs were prudently incurred. Rather, PURA's concern
is that GenConn sought to overrecover from ratepayers
because the generator applied to recover not only its
actual cost of debt but also a return on equity premised
on a capital structure that GenConn failed to maintain
despite its obligation to do so.[8] PURA may have a legiti-
mate grievance in this regard, and, if so, PURA would
appear to have jurisdiction to remedy the problem
through corrective measures that it is authorized to
take with respect to GenConn's return on equity. It is
clear, however, that the legislature did not intend such
measures to include allowing PURA to override the
express, specific provision in § 16-243u entitling the
generator to recover its actual and prudently incurred
cost of debt.

In my view, the single sentence in § 16-243u relied
on by the majority to import the entire rate-making
apparatus of § 16-19e cannot bear the heavy weight
assigned to it. The provision states only that PURA shall
review the generator's recovery of costs "consistent
with the principles" set forth in §§ 16-19, 16-19b and
16-19e. General Statutes § 16-243u. If the legislature had

---

[7] When GenConn completed the refinancing and sent PURA its compliance
filing in 2013, the interest costs for 2021 were projected at approximately
$8,908,000. These costs ultimately amounted to $8,573,000.

[8] PURA argues that denying GenConn's full cost of debt is justified because
its 2021 proposal sought an excessive return on its capital (its return on
debt and equity combined). In its final decision, PURA found that GenConn
sought both to recover its full cost of debt and to "simultaneously earn [a
return on equity] based on a different debt-to-equity ratio" than that approved
by the agency or actually maintained in the project by GenConn.

intended this language to mean that, notwithstanding the specific provisions of § 16-243u expressly entitling the generator to recover its prudently incurred costs, PURA nonetheless may in its discretion disallow recovery of any such costs on the basis of the general rate-making principles set forth in § 16-19e, then it is a grossly imprecise and confusing way to express that grant of authority. I would not construe this language to encroach any more than necessary on the far more specific directive of the preceding sentence, which employs plain language to entitle the generator to recover its prudently incurred costs.

In the same regard, it is also clear to me that the majority misapprehends the statutory scheme when it concludes that, "[i]f PURA had no power to review the recoverable capital at these annual rate cases and was merely required to allow recovery of any cost that had already been deemed prudent, there would be no purpose for the annual review." Part I of the majority opinion. This argument loses all force when we recognize that the annual review operates to consider *forecasted* costs on a *prospective* basis, as PURA made clear in the criteria decision: "[PURA] will use a forecasted rate year. All costs will be forecasted at the time of the annual rate case for the upcoming 'rate year' subject to the provisions described below." The purpose of the prospective approach is to incentivize generators to control their costs in the upcoming year. This is why the criteria decision provides that "[g]enerators will be allowed to keep any over earnings and will be at risk for any underrecovery during the rate year." The process, in other words, is premised on the fact that the contemplated costs are projected costs that have not yet been reviewed or approved by PURA as prudently incurred. To name a few, these costs will typically include operation and maintenance expenses, fuel costs, and other as yet approved costs for which the generator seeks

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

recovery. Depending on the circumstances, the review may also include cost of debt—but not in the present case in connection with costs incurred in the 2012 refinancing, which already have been deemed to be prudently incurred.

Two decisions of PURA and its predecessor, DPUC, bolster my conclusion that GenConn is entitled to recover its prudently incurred cost of debt. See footnote 1 of this opinion. The first is the criteria decision issued by DPUC in 2007. When DPUC issued the criteria decision, the agency anticipated that generators may seek to obtain refinancing in the future and specifically addressed a generator's entitlement to recover its cost of debt after a refinancing—the context of the present case. The criteria decision assures all prospective generators as to how the agency would proceed with respect to the cost of debt incurred in connection with a refinancing: "All refinancings will be required to be approved by the [agency]. *Projects will recover the actual interest expense, subject to prudency investigation, if the actual costs exceed the costs included in their proposal.*" (Emphasis added.) I take this to confirm that the generator is entitled to recover its prudently incurred cost of debt and, in the case of a refinancing approved by the agency, that the generator will be entitled to recover the prudently incurred interest expenses associated with the refinancing, even if the cost exceeds those originally approved.

With this assurance, GenConn subsequently requested PURA's approval to refinance the project in 2012 due to advantageous market conditions. PURA approved that request in its August 8, 2012 refinancing decision, thereby authorizing GenConn to incur the attendant costs consistent with the refinancing proposal. GenConn obtained its refinancing on September 17, 2013, and PURA does not contend that the actual costs thereby incurred exceed the costs that GenConn had

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

included in its proposal[9] or "dispute that the costs Gen-Conn incurred from its 2012 refinancing were prudent."

Second, my interpretation of the statute also finds support, ironically, in a concession made in PURA's final decision under review in this very appeal, which identifies the operative principle of cost recovery in clear and certain terms and recognizes that PURA must allow GenConn to recover its cost of debt. The final decision provides that "[a] primary component to 'just and reasonable cost-of-service compensation' [required by § 16-243u] is the return on capital employed to finance the facilities used to provide service. The return is designed to *pay interest on debt* and provide a fair return on equity." (Emphasis added.) I am unable to reconcile this acknowledgment of the statutory mandate with PURA's decision denying GenConn the funds needed to pay the interest on its debt.

It also is important to understand that GenConn's decision to refinance was highly advantageous to ratepayers. In approving the refinancing proposal, PURA observed that GenConn pledged only to execute the refinancing if it was "economically favorable to Connecticut ratepayers at the then current market conditions, *including interest costs* . . . ." (Emphasis added.) PURA further noted that GenConn's proposal was "premised on refinancing the present [l]oan [f]acility to lower costs to Connecticut ratepayers. . . . [S]ince interest rates are at historic lows, GenConn believes that it is important to refinance the [l]oan [f]acility if it can access the capital markets and or bank markets to obtain a lower rate on the proposed financing which will benefit Connecticut ratepayers." PURA itself concluded that, "based on the assumptions

---

[9] After refinancing, GenConn submitted its compliance filing on November 15, 2013, containing schedules of its projected interest costs from 2013 to 2041. PURA permitted GenConn to recover these interest costs each year from 2013, when the refinancing went into effect, until 2020. Only in 2021, the year presently at issue, did PURA deny GenConn's recovery of these costs.

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

. . . savings [should be] produced through refinancing,'' and that the ''approvals are in the public interest . . . .'' After refinancing, GenConn submitted its compliance filing to PURA, ''demonstrat[ing] that the [refinancing] resulted in a benefit to the ratepayers of approximately \$23.4 million, or 85 basis points, on an all-in cost basis over the life of the debt.'' PURA has never contended that the refinancing was not ''economically favorable to Connecticut ratepayers'' as required.

There is no reason to believe that the legislature would enact legislation that would permit PURA to reverse course eight years after formally approving the refinancing and its attendant costs, and after accepting the benefits flowing to ratepayers as a result of the refinancing. PURA knew that the refinancing required GenConn to incur interest costs, and PURA's decision to approve the refinancing necessarily means that it deemed the benefits to justify those costs. Again, PURA has never suggested otherwise and, to this day, deems those costs prudently incurred.

This interpretation of the statutory scheme also makes sense of a statute that permits private businesses to participate and compete in a newly created in-state market for the construction and operation of peaking electric generation facilities on a cost of service basis.[10] As GenConn argues, ''[f]or generators to be willing to invest hundreds of millions of dollars in Connecticut's critical energy infrastructure, and for Connecticut residents to benefit from the resulting reliable electric service, generators need to have confidence that PURA will enforce the project terms set by the Connecticut legislature and PURA itself.'' In a single paragraph of statutory text, the Connecticut legislature assures prospective generators that they will recover their costs of service. Specifically with respect to costs recovered

[10] See 50 H.R. Proc., Pt. 20, 2007 Sess., pp. 6591–92, remarks of Representative Vickie Orsini Nardello.

GenConn Energy, LLC *v.* Public Utilities Regulatory Authority

as part of the annual retail generation rate contested case review, the generator is assured that it is legally entitled to recover its "prudently incurred costs . . . ." General Statutes § 16-243u.

Again, my construction of the statute does not mean that PURA is without recourse if it believes that Gen-Conn seeks to recover an overall return that is excessive in light of the project's actual capital structure for the year at issue. The mechanism for addressing that concern, however, is not artificially to reduce the actual and prudently incurred cost of debt previously approved by the regulatory agency. Instead, PURA appears to be authorized by § 16-243u, consistent with the principles set forth in § 16-19b, to reduce GenConn's return on equity to reflect the project's actual capital structure in any given year. See General Statutes § 16-243u (authorizing PURA to update a generator's return on equity at least once every four years). If, as PURA contends, GenConn impermissibly altered the project's capital structure by reducing its equity investment beneath proper limits but still sought to recover a return on equity as if its capital structure remained unchanged, then PURA presumably has statutory authority to address that situation by reducing the generator's return on equity to reflect the actual capital structure, or perhaps by other means. The appropriate alternative procedures and calculations PURA properly could use, however, are not issues before the court in the present case. The issue at this time is whether PURA is authorized by § 16-243u to deny GenConn's recovery of its prudently incurred cost of debt. I would conclude that it cannot do so on this record.

For the foregoing reasons, I respectfully dissent. I would reverse the trial court's judgment and direct that the case be remanded to PURA for further proceedings in accordance with this decision.